IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 17-305 |
| | : | |
| | : | |
| JASON DUNLAP | : | |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR PRETRIAL RELEASE**

Mr. Dunlap moves the Court for an order granting his release. Mr. Dunlap is a pre-sentence defendant currently detained at the Essex County Jail in New Jersey in lieu of the Federal Detention Center in Philadelphia (FDC). Mr. Dunlap's father recently received an Alzheimer's Disease diagnosis and is in steady decline and the care falls to Mr. Dunlap's mother who suffers under an autoimmune disorder. Mr. Dunlap's case is listed for sentencing in December but that hearing will undoubtedly be continued as the sentencing hearing awaits resolution of the trial of the principal defendant in the case.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

Mr. Dunlap seeks release to aid in the care of his father and to see him before his father loses his cognitive functions. In addition, Mr. Dunlap's release to home confinement will permit him to have therapy that is already arranged.

During the period of release Mr. Dunlap will live at 324 Turnpike Street, Milesburg, PA

16853 address with his parents.

## I.     Procedural History

On June 7, 2017, Mr. Dunlap was indicted by a grand jury in the Eastern District of Pennsylvania charging him with distribution of heroin where a death occurs, eight counts of possession with intent to distribute heroin and one count of distribution of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c). On August 9, 2017, Mr. Dunlap was arrested and taken into federal custody on the above charges. He has been detained since then.  On August 31, 2017, Mr. Dunlap was arraigned on the charges and stipulated to pretrial detention before Magistrate Thomas Reuter.

## II.    Factual Background

Mr. Dunlap is currently detained in the Federal Detention Center Philadelphia pending sentencing on an Indictment charging him with distribution of heroin where a death occurs, eight counts of possession with intent to distribute heroin and one count of distribution of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c).

Mr. Dunlap has been detained since his arrest in pretrial detention facilities in this matter on August 9, 2017.  <u>This is a period of pre-trial detention in excess of five years.</u>  The cause for the delay is no fault of Mr. Dunlap who, on March 8, 2018, a mere six months after being arrested, entered a guilty plea pursuant to a cooperation plea agreement.   During his extraordinary period of pre-trial detention, Mr. Dunlap became infected with the COVID-19 virus and was subjected to an extremely difficult period of confinement in the special housing unit, not due to any infraction whatsoever as he has none, but because it was determined by the jail to be the only place where they could safely house until his eventual transfer to a county jail in Essex County, New Jersey.  During that period of confinement, Mr. Dunlap was housed with a

violent offender who was in the SHU because of prison violence.  This caused great stress and anxiety on top of the fear he and anxiety he suffered as a result of other threats against him.  Pre-trial detention is also more difficult than custody at federal correctional institutions in terms of limitations due to space and lack of programming.

      3.      Mr. Dunlap now suffers under the knowledge that his father has Alzheimers Disease with symptoms of vascular dementia that not only has obvious impact on his father's mental and physical health but has also become an enormous burden on Mr. Dunlap's mother who struggles to care for him in the face of his denial and hostility to the diagnosis.  See October 17, 2022 correspondence of Shirley Dunlap, attached hereto as Exhibit "A."  Mrs. Dunlap also is treated for undifferentiated connective tissue disease, an auto-immunine disease, the symptoms of which are exacerbated by the heavy stress of caring for her husband and managing an increasingly hostile relationship brought about by his response to the illness.  Mr. Dunlap naturally is desperate to have some time with his father before he loses the cognitive capacity to have any meaningful relations with him.  Mr. Dunlap also wishes to alleviate the stress and pain his mother suffers -as well as the physical impact it is having on her own medical condition - from the burden of caring for her husband.  See October 29, 2022 correspondence from Jason Dunlap attached hereto as Exhibit "B."

      **III.**    **The Bail Reform Act of 1984 and Mr. Dunlap's Release**

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).

Due to the crucial interests involved, it follows that a "case-by-case" approach is required

at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986); *see also United States v. Delker*, 757 F.2d 1390, 1397 (3d Cir. 1985); *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986).

### IV. Mr. Dunlap Poses A Little Risk of Danger or Flight

The charges against Mr. Dunlap are indeed very serious, distribution of drugs where a death has occurred. But as the Court has seen in these sorts of cases, there is a continuum of criminal culpability with a meaningful difference between those who are primarily drug users and participate in distribution as part of their addiction and others who are in it as a business. By all accounts, Mr. Dunlap was a serious addict who socialized in a community of drug abusers and purchased and shared larger quantities of drugs to economize and make his limited resources go farther. It does not lessen the tragedy of the death here but it is mitigating and strongly suggestive of a person who poses a lesser threat to the community than the person pedaling drugs as a commercial enterprise.

At the time of his offense, Mr. Dunlap worked as a chef putting in 60-70 hour weeks and lived in his parents home because so much of his income was consumed by his addiction. These are not the characteristics of a fast living commercial drug dealer. They are circumstances of an ordinary hard working person desperately addicted to drugs.

Jason Dunlap is first and foremost a heroin addict. The story of his addiction is an all too familiar one. Exhibit "D." It began with prescriptions of pain relief medication prescribed to address a painful jaw condition. (He has received Naproxyn for this condition in prison).

Eventually, Mr. Dunlap became dependent on this medication but found himself unable to afford it once he lost health insurance and was introduced to heroin as a cheap alternative. At the time of his offense, he was in the grip of his addiction and had been abusing heroin for seven years. And Mr. Dunlap's heroin habit was expensive. As a long term addict, his body was dependent on regular infusions of heroin to keep him from getting sick with the excruciating symptoms of withdrawal. During the period of his offense, Mr. Dunlap used 6-12 doses of heroin per day which he consumed nasally as did most of the users he knew.

      Mr. Dunlap has admitted to heroin distribution, pled guilty to the indictment and accepted responsibility for his actions. As stated above, while he is indeed guilty of drug distribution, his actions were driven not by the profit motive, or to fund a fast, materialistic lifestyle nor even to avoid the hardship and grind of an everyday job, motives that are common to most drug dealers.. To the contrary, Mr. Dunlap worked five to six days a week, often 8-12 hours a day in hot kitchens performing hard work for very modest pay. Mr. Dunlap distributed drugs to users, who, like himself, had difficulty financing their addiction. Mr. Dunlap drug activity was driven by a desire to stretch his dollars and obtain the greatest possible discount. Being a heavy user, Mr. Dunlap learned that buying bulk would result in lower prices which meant that he could support his habit with the modest salary he made as a cook. To buy bulk however Mr. Dunlap needed help financing the purchases. So he went to the people that he knew were also addicts and had them contribute money to the purchases in exchange for a share of the purchased heroin. These are people from whom Mr. Dunlap purchased heroin from time to time when he was short of the drug or could not assemble the money he needed to make a trip to Philadelphia. This included the decedent in this case, J.A. J.A. had on occasion supplied funds to Mr. Dunlap for bulk purchases of heroin and received his share. J.A. also provided Mr. Dunlap with morphine pills

and fentanyl patches from time to time. Mr. Dunlap was part of a loosely connected community of addicts who would associate for their mutual benefit, helping to finance bulk purchases from which they all benefited, and supplying drugs to each other when the need arose. Mr. Dunlap never gave anyone heroin that he had not himself used. In other words, Mr. Dunlap only delivered heroin from batches he purchased in substantial part for his own use.

Mr. Dunlap's involvement in the conspiracy did not begin with him as a purchaser and distributor of drugs, but rather as a driver for M.P. one of Mr. Dunlap's circle of addicted friends. M.P. had established a relationship with the dealer who Mr. Dunlap would ultimately come to purchase from. For approximately the first three of months of Mr. Dunlap's involvement with distributors in Philadelphia, he drove M.P. to Philadelphia on drug runs in exchange for having M.P.s front Mr. Dunlap a share of the heroin for personal use. Eventually, Mr. Dunlap began to make the trips himself.

Mr. Dunlap has been drug free for more than six years, primarily due to the three year period of pre-sentence incarceration but also including more than year of sobriety following the death of Mr. Dunlap's friend in this case which was a stark and traumatic wake up call for him. Mr. Dunlap has also continued to communicate, while incarcerated with Walter B Morrison, of Centre County Associates, an addiction counselor who he would treat with upon his release. Exhibit "C."

While in prison, Mr. Dunlap has been a model prisoner who devoted a great deal of time to tutoring other inmates toward getting their GEDs for which he received a commendation. *See* Bureau of Prisons, Positive Decision Report, attached hereto as Exhibit "E". Inmates to whom Mr. Dunlap provided aid and assistance have written him glowing letters of support. See

correspondence attached as Exhibit "F". Others who have known him for many years have also written moving letters of support. See correspondence attached as Exhibit "G."

**V.      Conditions of Release Are Available That Allow Mr. Dunlap To Be Treated Humanely While Also Ameliorating Any Danger To The Community**

Critically, during this temporary release, Mr. Dunlap will not be left to his own devices, but will be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[1] Here, Mr. Dunlap would reside with his parents under house arrest and being electronically monitored by pre-trial services. He would attend drug treatment therapy and indeed has been in regular contact while at prison with a drug treatment therapist that lives near his home. Finally, Mr. Dunlap has great experience and the capability of working as chef or kitchen manager if deemed appropriate by pre-trial services. In sum, there is a secure, structured and therapeutic environment available that would assure both the safety of the community and Mr. Dunlap.

---

[1] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

**VI.     Conclusion**

For all of the above reasons, there are exceptional reasons why Mr. Dunlap should be released immediately on electronic monitoring.

Respectfully submitted,

*/s/ Alan J. Tauber*
Alan J. Tauber, Esq.

Two Penn Center, Suite 900
Philadelphia, PA  19102
(215) 313-7188

Attorney for Defendant Jason Dunlap